# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

| | | |
|---|---|---|
| DONNA CHAMBERS, Petitioner, | * | No. 19-599V |
| v. | * | Special Master Christian J. Moran |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | Filed: September 22, 2026 |

Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA, for petitioner;
Emilie Williams, United States Dep't of Justice, Washington, DC for respondent.

## RULING FINDING ENTITLEMENT TO COMPENSATION[1]

Donna Chambers alleges that a tetanus, diphtheria and pertussis ("Tdap") vaccine she received on June 6, 2016, caused her to suffer from a shoulder injury in her left arm. Am. Pet., filed Mar. 24, 2021. The Secretary opposes compensation. Both parties relied on experts and advocated through briefs.

A review of the evidence and arguments shows that Ms. Chambers is entitled to compensation. The granting of entitlement is based upon Ms. Chambers establishing with preponderant evidence that the Tdap vaccine caused her to suffer from an injection site injury and subsequently adhesive capsulitis. The reasoning is set forth below.

### I. Factual History

The factual history in this case derives from various sources. The majority of the facts are found in Ms. Chambers's medical records and the records she filed from Sedgwick Claims Management Services regarding her workers' compensation claim. Additionally, Ms. Chambers filed affidavits in support of her petition.

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

**A. Medical Records and Workers' Compensation Records**

Ms. Chambers was born in 1968. Exhibit 3 at 7. Prior to the vaccination at issue, Ms. Chambers did not have a history of left shoulder pain or injury. See generally Exhibit 2. At the time of vaccination, Ms. Chambers was working as a pharmacist. Exhibit 6 (affidavit of Donna Chambers) at 1. On June 6, 2016, Ms. Chambers sought treatment at Beth Israel Deaconess Hospital for a needle stick injury that occurred at her workplace. Exhibit 5 at 9. Here, Ms. Chambers received the Tdap vaccination. Id. at 13. The administration site was recorded as "LD." Id.

A workers' compensation claim was initiated with Sedgwick Claims Management Services. See generally Exhibit 15. Claims Representative Darelle N. DeMarco was assigned to Ms. Chambers's claim. Id. at 193.

On October 3, 2016, Ms. Chambers visited Mattapan Community Health Center Primary Care for a gynecological exam. Exhibit 2 at 29. She reported left shoulder pain following her June 6, 2016 vaccination. Id. The doctor referred her to an orthopedist. Id. at 30.

Ms. Chambers presented to the Department of Orthopaedic Surgery at Brigham and Women's Hospital on October 11, 2016. Exhibit 3 at 13. She was first seen by a resident, Shalin S. Patel. The reason for the appointment was "left shoulder pain." Id. at 14. Dr. Patel recorded in the History of Present Illness section:

> 47 y.o. female RHD [right hand dominant] otherwise healthy who presents with left shoulder pain x 2 months. She states she cannot recall any recent trauma or accidents, but does remember a time about 4 months ago when she was reaching over her head to remove her shirt when she heard a pop in her left shoulder. Her shoulder pain did not start until 2 months ago. No pain at rest. Pain with shoulder ROM [range of motion]. Denies weakness, numbness, tingling. Her pain is primarily anterior and with reaching behind her back and over her head. Lying on her left shoulder causes pain. She is unable to zip up her own dress and has difficulty with dressing/undressing herself. Has tried intermitted NSAIDS [nonsteroidal anti-inflammatory drugs] with minimal relief. Has seen PCP who made the referral to our clinic. Has NOT tried any PT yet.
>
> She also states she had a Tetanus shot about 4 months ago from a needlestick injury while at work and has had a painless "lump" in her left lateral arm since.

Id. Imaging revealed "no acute fracture or dislocation" and "no significant degenerative changes." Id. at 15. In the Assessment and Plan, Dr. Patel wrote:

> No definite traumatic mechanism, though may be secondary to an overhead reach with subsequent "pop". Mild deltoid atrophy, painless lump in the lateral arm, and decreased shoulder ROM due to pain with anterior shoulder tenderness are positive notable findings. Specifically on exam, no evidence of biceps tendonitis or subluxation and equivocal signs of impingement. Likely subscapularis pathology,

> but may be due to quadrilateral space syndromes. Will obtain an MRI to further assess.

Id. Ms. Chambers was then seen by Dr. Arnold B. Alqueza, who wrote that he "agree[d] with the history, findings, assessment and plan documented by [Dr.] Patel." Id. Dr. Alqueza added:

> There is a swelling here that hasn't resolved. She points to the anterior shoulder as a source of her pain. She does have a sulcus sign on the left deltoid x-rays are negative. Given that her pain is so painful and she has swelling from injection and her exam is hard to determine the etiology of her pain will get an MRI . . . I feel she feels first very frustrated with how her shoulder feels and that she has a swelling from injection. Given this, I do not want to wait on an MRI in order to do therapy. I don't want to miss any significant pathology that may be caused by the injection.

Id. at 16. An MRI was ordered.

Emails between Sedgwick employees dated October 18 and October 19, 2016, questioned whether the MRI would be covered and if an injury to Ms. Chambers's left shoulder would be compensable. Ms. DeMarco explained that when Ms. Chambers was treated for her needlestick injury, she "received a tetanus shot on her left arm and now has a hard lump that is causing pain to shoot up her arm into the shoulder. Left shoulder was not part of the initial injury but SEEMS TO BE the result of treatment received for it." Exhibit 15 at 186. The MRI was approved, with the notation that "This does not guarantee that benefits will be payable under Workers Compensation coverage." Id. at 184-85.

Ms. Chambers underwent the MRI on November 1, 2016. Exhibit 4 at 14. The impression of the treating radiologist was moderate teres minor muscle atrophy with fatty infiltration, no rotator cuff tear, focal tenosynovitis of the biceps tendon at the level of proximal humeral diaphysis, and small glenohumeral joint effusion. Id. at 15.

Ms. Chambers attended acupuncture appointments with Dr. Sunyoung Lee at Sun Wellness Acupuncture on November 8 and November 14, 2016. See Exhibits 10 (handwritten acupuncture records) and 11 (transcription of the acupuncture records, faxed Sept. 29, 2021). The main complaint in the handwritten version reads:

> L shoulder pain – since tetanus shot
> 2 months
> all muscle soreness. ROM difficulty.

Exhibit 10 at 3. The transcription provided later by the office reads slightly differently: "L shoulder pain – since tetanus shot 2 months ago. All muscle soreness. ROM difficulty." Exhibit 11 at 2. Although Dr. Lee signed off on the handwritten notes, it is unclear if she also generated the transcription.

Dr. Alqueza reviewed the MRI on November 28, 2016. Exhibit 3 at 30. He observed that, "Other than some mild LHB [long head of the biceps] tenosynovitis and atrophy of the TM

[teres minor], which can be incidental, the MRI is normal." Id. However, he noted that "the tech could not go low on the scan to include the painful lump as it was outside the protocol." Ms. Chambers reported that acupuncture helped "a little" but she still had a lot of pain. Id. Dr. Alqueza asked "if the shot went to the bone as SIRVA (shoulder injury from a vaccine) is a described phenomena" and noted Ms. Chambers's vaccination in the area. He wanted to schedule a left humerus MRI, which would include the lump. Id.

Before scheduling a second MRI, Ms. Chambers wanted to talk with Dr. Alqueza again about other options, and considered getting a cortisone injection. Exhibit 3 at 34-35. She presented to Dr. Alqueza on January 13, 2017, requesting the cortisone injection. Id. at 34. She reported that she had been feeling better, but still had the lump and still had pain. Dr. Alqueza wrote:

> I recommend we get the MRI of the arm as the lump is still there from the tetanus shot. Usually there is a reaction from vaccines that's been described and the treatment of that is not cortisone. She understands and we will get the MRI of the arm. This [is] to be of the humerus.

Id.

On February 6, 2017, Sedgwick claims representative Ms. DeMarco reported that she had spoken with Ms. Chambers, who was "very unhappy with the doctor and not having a [diagnosis]." Exhibit 15 at 137. Ms. DeMarco noted the upcoming MRI to diagnose "the hard painful lump on her shoulder that she sustained after being vaccinated post needle stick injury." She further noted that Ms. Chambers was "very upset with the lack of progress with her medical care and she is in pain." Id. However, Ms. Chambers "agreed she would attend the MRI." Id.

The MRI on Ms. Chambers's left humerus was done on February 13, 2017. Exhibit 4 at 25. The record notes a "painful lump for many months at the level of the deltoid insertion, status post flu shot."[2] The impression of the interpreting radiologist reads:

> Approximately 2.5 cm proximal to the site of the skin marker is a 6 mm focus of T1 hyperintensity in the subcutaneous tissue with surrounding fat stranding, likely representing a hematoma related to the recent flu shot. No underlying mass.

Id. at 25-26. Dr. Alqueza reviewed the MRI on February 15, 2017. He requested that Ms. Chambers come in for another appointment so he could "examine her shoulder to find out if she has a frozen shoulder or if the lump is the cause of her pain." Exhibit 3 at 47. Dr. Alqueza stated, "I'm not sure why she is still having pain from the vaccine shot. If she has a frozen shoulder which the MRI of the shoulder does not indicate, we could do an [ultrasound] guided injection. If the lump is the source of her pain, I would recommend [ultrasound] and massage to help resolve the hematoma." Id.

---

[2] The references to a flu shot appear to be errors, as Ms. Chambers received the Tdap vaccine.

Ms. Chambers returned for an appointment on February 28, 2017. Exhibit 3 at 51. She was first seen by resident Dr. Abhiram Bhashyam. The lump in her arm was again described as "painful." Ms. Chambers reported that she had "been trying massages for the last month and this has actually significantly helped her range of motion and pain." Id. at 52. The assessment and plan was:

> 48 y.o. female RHD otherwise healthy who presents with painful left arm hematoma and a stiff left shoulder. The mass is likely vaccine related and she may also have a frozen shoulder (now in the frozen stage). Given that she has not tried PT yet, we will refer her to PT for ultrasound, soft tissue modalities, and ROM/strength. We discussed that if PT causes her significant pain, she should call us and we can send her for ultrasound guided injection of the shoulder. She was in agreement with this plan.

Id. at 53.

Dr. Alqueza agreed with Dr. Bhashyam's history, findings, assessment, and plan. Id. at 54. He added:

> Patient is very happy to try ultrasound and massage over the hematoma found on the humerus MRI. Clinically she seems to be having adhesive capsulitis even though shoulder MRI did not show thickening of her capsule . . . She knows stitches take up to 2 years for the frozen shoulder to resolve. I think because of the pain at the deltoid from the vaccination she did not move her shoulder and thus has a frozen shoulder. She understands. I'll see her back in 4 months. If not better we may entertain a ultrasound-guided cortisone injection to the glenohumeral joint.

Id.

Ms. Chambers saw Physical Therapist Margarita Miras on March 11, 2017. Exhibit 4 at 40. Ms. Chambers relayed that she received the tetanus vaccine in her left shoulder "and soon after she developed a lump on the anterior aspect of her proximal humerus along muscle belly of the biceps. The lump has gotten progressively harder and more bothersome." Id. Ms. Chambers had progressively lost shoulder function over the last year, and the pain had moved to the anterior aspect of the shoulder. Id. She rated her pain, on average, as a 6 out of 10, but it ranged from a 3 to a 10. Id. at 41. Ms. Miras's clinical impression was that Ms. Chambers had "MRI findings and signs and symptoms consistent with a LHB [long head of biceps] tendinopathy and secondary adhesive capsulitis." Id. at 42. She assessed Ms. Chambers as having a good prognosis and would benefit from skilled physical therapy. Id.

Ms. Chambers returned to physical therapy on March 15, 2017, where she saw Physical Therapist Minhee Throneburg. Exhibit 4 at 52. Ms. Throneburg opined that Ms. Chambers's signs and symptoms were consisted with early adhesive capsulitis. Id. at 53. Ms. Chambers did not attend her next three appointments and cancelled the remaining appointments. See Exhibit 14 at 2. Ms. Chambers reported to her Sedgwick case manager that she did not attend due to a family emergency and family health issues. Exhibit 15 at 33.

On May 15, 2017, Dr. Alqueza filled out paperwork to be sent to Ms. Chambers's employer. Exhibit 3 at 63. He did not think she had missed any work due to her injury. Dr. Alqueza noted that the MRI of her shoulder showed thickening of the inferior glenohumeral ligament, and a frozen shoulder seemed to be the biggest issue. He also noted that she had a "small hematoma in proximity of her pain from a Td shot for a needle stick at work based on a humerus MRI." Id.

No subsequent medical records were filed.

**B. Affidavits**

When she filed her petition for compensation on April 23, 2019, Ms. Chambers supported her claim with her own affidavit and affidavits from two of her coworkers.

1. Affidavit of Donna Chambers

In her own affidavit, dated April 12, 2019, Ms. Chambers averred that, the day after her vaccination, her arm was sore and painful at the injection site. Exhibit 6 ¶ 4. She took ibuprofen and used cold compresses, but the pain was worse and the site of injection was still swollen a few days later. Id. Ms. Chambers recounted that her shoulder pain worsened over the following weeks, and the injection site was hard and swollen. Id. ¶ 5. However, as she had administered the Tdap vaccination to patients before and knew there were often complaints about pain, she did not think it was serious. Id.

Ms. Chambers next averred that she called the emergency room after a few weeks. Exhibit 6 ¶ 6. Her call was transferred and she left a voicemail, but received no call back. Id. After another few weeks, she called the emergency room again, and was told by a doctor that she needed to follow up with her primary care provider. Id. ¶ 7.

Ms. Chambers denied making a statement about an overhead reach with a pop, stating that she had "no idea where that note could have come from" and that she was "very clear with all of [her] doctors that she believed the injury was caused by the Tdap vaccination that June." Exhibit 6 ¶ 9 (referencing Exhibit 3 at 14, 15).

2. Affidavit of Irene Gendel

The next affidavit is from Irene Gendel and is dated April 15, 2019. Exhibit 7. Ms. Gendel recounted that "Right after getting a TDap vaccine," Ms. Chambers returned to work and "complain[ed] of unusual pain upon returning to work, which got progressively worse over several days and then months. Id. ¶ 3. Ms. Gendel further stated that the "arm pain became so severe that it interfered with her ability to perform basic job duties," and that "Making any movement with her arm became excruciatingly painful, to the point that [she] couldn't move her arm at all, and her range of motion was very limited." Id. ¶ 4.

Ms. Gendel stated that Ms. Chambers "had to undergo physical therapy for months." Exhibit 7 ¶ 5. "The bullseye area where the TDap shot was administered around the deltoid

muscle became so dense that you could palpate the dense ball that formed underneath and you could see it with a naked eye." Id.

3. Affidavit of Kellie Simonini

The third affidavit, dated April 17, 2019, is from Kellie Simonini. Exhibit 8. Ms. Simonini stated that "Over the days and weeks that followed [Ms. Chambers's vaccination] you could still clearly see the [site] of injection protruding. Her mobility was becoming limited during regular motions. Stretching, reaching for, and counting medications was excruciatingly painful, as it showed in her face." Id. ¶ 6. Ms. Simonini also recounted a time when Ms. Chambers brushed her arm against a cabinet "and dropped to her knees with tears in her eyes due to the pain." Id. ¶ 6.

## II. Procedural History

Ms. Chambers's case proceeded in a fairly straightforward manner. After Ms. Chambers filed her initial materials and records, both parties retained experts and presented expert reports. Following the conclusion of the expert phase, the parties filed briefs. More details are provided below.

### A. Initial Materials

Represented by Attorney Muller, Ms. Chambers initiated this case by filing a petition on April 23, 2019. In her original petition, Ms. Chambers alleged that the Tdap vaccine caused her to suffer from "tendinopathy and a hematoma of the left shoulder related to vaccine administration ('SIRVA')." Pet. at 1. With the petition, Ms. Chambers submitted several medical records and affidavits. Exhibits 1 through 8.

Ms. Chambers was ordered to file additional records and her workers' compensation records. Order, issued July 18, 2019. Ms. Chambers did so, and filed a statement of completion on August 27, 2019. After reviewing the material, the Secretary filed a status report on June 26, 2020, indicating that he intended to defend the matter and proposing a deadline for his Rule 4(c) Report.

The Secretary filed his Rule 4(c) Report on August 28, 2020, recommending against an award of compensation. The Secretary argued that Ms. Chambers had not established that she suffered a Table injury, as she had not established that her left shoulder pain began within 48 hours of vaccination. Resp't's Rep. at 7-8. The Secretary also argued that Ms. Chambers could not prevail on a causation-in-fact claim as she had not met her burden of proof under Althen. Id. at 9-10.

On February 22, 2021, while the case was still in the Special Processing Unit, an Order to Show Cause issued. The Chief Special Master advised that the evidence suggested that Ms. Chambers did not satisfy the Table SIRVA requirements. Order to Show Cause at 2. Specifically, it appeared that the onset of her pain "occurred more than 48 hours after vaccination, and that the nature of her injury (the unresolved hematoma/lump) is not equivalent to the musculoskeletal-type injuries contemplated by Table SIRVA claims." Id. at 2-3. Ms.

Chambers was thus ordered to show cause as to why her Table claim should not be dismissed. Id. at 3.

In response, Ms. Chambers filed an amended petition on March 24, 2021, now asserting a claim for "SIRVA injuries resulting from adverse effects of the Tdap vaccination." Am. Pet. at 1. Ms. Chambers explained that she consented to the dismissal of her Table SIRVA claim but would "proceed with a causation in fact SIRVA claim." Pet'r's Status Rep., filed Mar. 24, 2021. Ms. Chambers also disputed that the onset of her symptoms occurred more than 48 hours post-vaccination. Id.

The case was transferred out of the Special Processing Unit and assigned to a special master (not the undersigned) on August 6, 2021. The parties were ordered to file expert reports. Order (non-PDF), issued Aug. 6, 2021. However, Ms. Chambers requested that a briefing schedule be set for a determination of onset prior to filing expert reports. Pet'r's Status Rep., filed Aug. 19, 2021.

A status conference was held on September 13, 2021. The special master explained that a determination of onset was unnecessary, as the medical records showed that Ms. Chambers developed a painless hematoma at the injection site, and that the hematoma became painful over time. Order, issued Sept. 14, 2021, at 1. The onset of shoulder pain was repeatedly reported to be in August 2016. Id. The issue, then, was not onset, but rather how the vaccination resulted in the development of a painless hematoma that subsequently became painful Id. at 3. Ms. Chambers was ordered to file an updated workers' compensation file, including the final medical assessment and resolution of the claim, as well as a transcription of indecipherable acupuncture records. Id.

Ms. Chambers filed the transcription of the acupuncture records on September 29, 2021 as Exhibit 11, and after two extensions of time and the issuance of a subpoena, she filed additional documents related to her workers' compensation claim on December 21, 2021 as Exhibit 12. However, Exhibit 12 "appear[ed] to be a 2019 email thread between petitioner's counsel's paralegal and Sedgwick Claims Management Services that supposedly contain 'medicals on file for Ms. Donna Chambers,'" but the "actual medical assessment and/or medical records [were] not contained in the PDF—only an inaccessible Google link appears at the top of page 2 of Exhibit 12." Order, issued Feb. 2, 2022. Furthermore, the resolution of the claim did not appear in the exhibit. Ms. Chambers was ordered to file an affidavit confirming whether she was evaluated by any physician on behalf of her workers' compensation claim and to confirm whether the claim was resolved. Id.

Ms. Chambers filed an affidavit dated February 16, 2022, averring that she never saw a doctor through workers' compensation and never received any documents regarding a resolution or whether the case was closed. Ms. Chambers stated, "As far as I know, they paid my medical bills and the case is over. I believe the last time I spoke with Sedgwick, they told me they were closing the case." Exhibit 13. Ms. Chambers also noted that she did not take time off of work because it can be difficult to get time off, and as manager, she was under a lot of pressure to keep the pharmacy running. Id.

Over the next few months, Ms. Chambers worked to obtain her complete workers' compensation file from Sedgwick. After filing the additional exhibits, Ms. Chambers confirmed

via a status report on June 22, 2022, that she had filed the full workers' compensation file and that the file had been closed in August 30, 2017.

The Secretary was satisfied that the record was complete, and intended to continue defending the case. Resp't's Status Reps., filed July 25, 2022 and Aug. 24, 2022. Ms. Chambers requested the opportunity to file an expert report. Pet'r's Status Rep., filed Sept. 23, 2022.

**B. Experts and Their Reports**

The parties each retained an expert in orthopedics. Ms. Chambers submitted reports from Dr. Omar D. Hussamy, and the Secretary submitted reports from Dr. Paul J. Cagle, Jr.

1. Dr. Hussamy and his First Report

Ms. Chambers filed the first report from Dr. Hussamy on December 15, 2022. Exhibit 18. Dr. Hussamy is an orthopedic surgeon who is board certified by the American Board of Orthopedic Surgery. He received his Bachelor of Medical Science from the University of St. Andrews, Scotland, in 1984, and received medical degrees from Cambridge University, England, and the University of Virginia in 1986 and 1988. He then completed a general surgical internship in orthopedic residency at the University of North Carolina, followed by a fellowship in sports medicine and hand surgery at the University of Virginia. Id.; see also Exhibit 19 (curriculum vitae). Dr. Hussamy has worked as an orthopedic surgeon since 1994. Exhibit 19.

Dr. Hussamy summarized that Ms. Chambers "developed a hematoma in the left lateral upper arm followed by the development of pain, deltoid atrophy with limited range of motion of the left shoulder." Exhibit 18 at 4. He opined that "This was the direct result of the Tdap vaccine which led to the hematoma and development of a lump. This became painful and she developed adhesive capsulitis of the left shoulder." Id.

Dr. Hussamy stated that the course of Ms. Chambers's injury was "consistent with SIRVA – inadvertent overpenetration of the vaccine needle, resulting in an inflammatory response." Exhibit 18 at 4. He explained that symptoms such as limited range of motion of the shoulder, weakness in the rotator cuff muscles, and tenderness of the rotator cuff are common in SIRVA. Dr. Hussamy further stated that the case "obviously involves an atypical presentation of a SIRVA injury," but asserted that some cases have delayed symptoms of up to two months. Id. "In this case, the hematoma seen on MRI of the left humerus was caused by the vaccination, as confirmed by [Ms. Chambers's] treating physicians. The hematoma subsequently became painful, likely leading to reduced mobility and restricted movement of the left shoulder, resulting in frozen shoulder." Id. at 4-5.

As to the first Althen prong, Dr. Hussamy cited medical literature describing how a vaccine can cause a hematoma or abscess, and stated that Ms. Chambers's hematoma subsequently became painful and resulted in frozen shoulder. Exhibit 18 at 5. Of the literature cited, Dr. Hussamy highlighted the Wood & Ilyas article, which "describes how an injection can potentially cause a location infection, and can result in cellulitis, abscess, septic bursitis, septic arthritis, or osteomyelitis," and the Chow article, which "follows a patient who developed

progressive pain two weeks after his second Covid vaccine" and "involves the development of a hematoma or lump related to vaccine administration." Id. (citing Wood & Ilyas and Chow).[3]

For the second prong, Dr. Hussamy opined that there was a logical sequence of cause and effect in that Ms. Chambers developed a mass followed by pain and shoulder-related sequelae after receiving the vaccine. He also noted that Ms. Chambers's treating doctors linked the vaccine to her shoulder injury. Exhibit 18 at 5. Finally, for the third Althen prong, Dr. Hussamy opined that the development of a mass immediately after vaccination fits temporally with vaccine-causation, followed by a development of pain and limited range of motion. Id. at 6.

2. Dr. Cagle and his First Report

The Secretary filed Dr. Cagle's first report on March 1, 2023. Exhibit A. Like Dr. Hussamy, Dr. Cagle is an orthopedic surgeon who is board certified by the American Board of Orthopedic Surgery. Id. at 1; Exhibit B (curriculum vitae). He graduated from St. Ambrose University with a Bachelor of Science in 2004, and received his medical degree from Loyola University Chicago Stritch School of Medicine in 2008. Exhibit B at 1. Dr. Cagle then completed an orthopedic surgery residency at the University of Minnesota, a shoulder and elbow fellowship at Mount Sinai Hospital, and a shoulder fellowship at Private Hospital Jean Mermoz/Centre Orthopaedic Santy in Lyon, France. Id. He held the position of Assistant Professor/Interim Chair in the Department of Orthopaedic Surgery at the Southern Illinois University of Medicine from 2014 to 2016. At the time of filing the expert report, Dr. Cagle was the Associate Professor and Associate Program Director in the Department of Orthopedics at the Ichan School of Medicine at Mt. Sinai. Id.

Dr. Cagle noted that SIRVA is "a condition created by law, but is not itself a medical diagnosis." Exhibit A at 2. He highlighted the "pop" memorialized in the October 11, 2016 medical record, calling this "a clear and documented possible reason for any subsequent shoulder pain." Id. Dr. Cagle also argued that "the MRI clearly demonstrates additional pathology that could cause shoulder pain," referring to the biceps tenosynovitis and teres minor muscle atrophy. Id. He explained:

> Biceps tenosynovitis represents a painful condition well known to cause pain and functional issues with the shoulder. Perhaps even more importantly, the MRI demonstrates atrophy of the teres minor (a part of the rotator). Atrophy represents a chronic change where the muscle quality is deteriorating. One potential cause of this is quadrilateral space syndrome (as mentioned in the visit on 10/11/16) but unfortunately this important finding was not medically investigated. Thus, a definitive explanation for why chronic deterioration in the shoulder is not provided, but a chronic change causing atrophy of the rotator cuff is a clear and reasonable explanation for shoulder pain.

---

[3] Chelsey T. Wood & Asif M. Ilyas, Shoulder Injury Related to Vaccine Administration: Diagnosis and Management, 4 J. HAND SURG. GLOB. ONLINE 111 (2022). Filed as Exhibit 33.

Jacky C.K. Chow et al., Shoulder injury related to SARS-CoV-2 vaccine administration, 194 CMAJ E46 (2022). Filed as Exhibit 32.

Dr. Cagle next addressed the hematoma. He pointed out that the size was 6mm, which is less than one quarter of an inch. Exhibit A at 3. He further highlighted that the mass was along the mid-humerus, which is "nearly halfway down the arm." Dr. Cagle thought it "unlikely the vaccination was given in such a distal location, but assuming that it was, this is distal to the rotator cuff and shoulder capsule later discussed to have caused the frozen shoulder." Id. Dr. Cagle stated that Dr. Hussamy had provided no viable explanation as to why an injection caused a small hematoma that caused shoulder pain, nor an explanation as to when and how the distal mass went from a painless to painful bump that then caused shoulder pain. Id.

Dr. Cagle then turned to Dr. Hussamy's discussion of the Althen prongs. Dr. Cagle argued that the SIRVA-related literature cited by Dr. Hussamy did not provide an explanation as to how a small hematoma distal to the shoulder could cause a frozen shoulder. Exhibit A at 3. As to the second prong, Dr. Cagle pointed to the pop in Ms. Chambers's shoulder occurring close in time to the vaccination as "a clear and reasonable explanation for any subsequent pain." Id. Finally, Dr. Cagle noted that Ms. Chambers did not complain of pain for four months, and again cited the shoulder pop as a viable explanation for the pain matching the appropriate temporal timeframe. Id. at 4.

3. Dr. Hussamy's Second Report

In rebuttal, Ms. Chambers filed a second report from Dr. Hussamy on May 4, 2023. Exhibit 37. Dr. Hussamy acknowledged that Ms. Chambers did not meet the Table criteria for SIRVA, but maintained that she presented a case of "atypical SIRVA" in which "the Tdap vaccine initially caused a hematoma which developed over time into physical symptoms including pain and reduced range of motion." Id. at 1. Dr. Hussamy also reasserted that the SIRVA literature he cited provided the theory and "has been routinely accepted in vaccine court." Id.

Dr. Hussamy asserted that "Dr. Cagle ignored all reference to a vaccination in [Ms. Chambers]'s medical records," and pointed out that only the October 11, 2016 record mentions the shoulder pop. Exhibit 37 at 1-2. He next addressed the MRI findings, stating that "Biceps tenosynovitis represents as a painful condition which causes decreased range of motion of the shoulder with resulting disuse of the shoulder resulting in teres minor muscle atrophy." Id. at 2. Additionally, Dr. Hussamy explained that "adhesive capsulitis is a clinical diagnosis based on Dr. Alqueza's findings and is commonly not diagnosed by an MRI scan." Id. He noted Dr. Alqueza's opinion that "Ms. Chambers was having adhesive capsulitis despite the shoulder MRI scan not showing thickening of the capsule" because she did not move her shoulder due to the pain and thus developed a frozen shoulder. Id.

Finally, Dr. Hussamy maintained that there was a proximate temporal relationship between the vaccination and injury, as the medical records show that Ms. Chambers developed a lump soon after her vaccination, which grew progressively harder and more bothersome over time, causing progressive loss of shoulder function. Exhibit 37 at 2.

4. Dr. Cagle's Second Report

In his second report, filed on July 5, 2023, Dr. Cagle took issue with Dr. Hussamy's assertion of an "atypical SIRVA," stating that Dr. Hussamy had not explained what an "atypical

SIRVA" is, nor had he "provided a sound medical argument explaining the exact mechanism of injury, the anatomy involved and the subsequent diagnoses." Exhibit C at 1. Dr. Cagle explained that, with SIRVA, "the commonly understood mechanism is overpenetration of the deltoid leading to injury and/or inflammation," which did not seem to be the mechanism advanced by Dr. Hussamy.

Dr. Cagle disputed that he had ignored the references to the vaccination in the medical records, pointing to the section of his initial report where he summarized these records. Rather, Dr. Cagle argued, he interpreted the data differently and saw the "pop" as the more likely cause of the shoulder pain. Exhibit C at 1. Regarding Dr. Hussamy's statement that biceps tenosynovitis results in teres minor atrophy via disuse of the shoulder, Dr. Cagle stated that this was "unsupported by medical fact" and that, to the best of his knowledge, teres minor atrophy is "not linked scientifically to biceps tendinitis." Id.

Dr. Cagle maintained the relevance of the "mechanical pop" reported during the October 11, 2016 visit and the "uninvestigated potential of other sources (quadrilateral space syndrome)." Exhibit C at 2. He reiterated that Dr. Hussamy still had not presented a viable mechanism to explain "how a vaccination given distal to the shoulder resulting in a less than ¼ of an inch lump caused a SIRVA." Id.

5. Dr. Hussamy's Third Report

Ms. Chambers was instructed to "file an expert report addressing the issues raised in Dr. Cagle's report (ECF No. 61), specifically all questions raised by Dr. Cagle as they relate to Dr. Hussamy's opinion that petitioner suffered an 'atypical SIRVA' injury." Order (non-PDF), issued July 5, 2023.

Ms. Chambers filed Dr. Hussamy's third report on August 28, 2023. Exhibit 38. Dr. Hussamy explained that "An atypical SIRVA is a shoulder injury resulting from vaccination that does not meet the typical criteria of a SIRVA injury." Id. at 1. Here, "the atypical aspect is the development of a hematoma from a vaccination and the hematoma subsequently developing into physical symptoms," whereas a "typical SIRVA" involves immediate pain and inflammation. Id. Dr. Hussamy disagreed that the "pop" was the ultimate cause of Ms. Chambers's injury, arguing that Dr. Cagle did not explain how a pop would cause pain to develop two months later, and that it was "more likely that her injury resulted from the tetanus vaccination." Id. at 2.

6. Dr. Cagle's Third Report

The Secretary filed Dr. Cagle's third report on October 30, 2023. Exhibit D. Dr. Cagle stood by his statements that "a hematoma distal to the shoulder has not been demonstrated to definitively cause a SIRVA." Id. at 1. He pointed out that the Wood & Ilyas article is only a review article, which in turn cites a single case report (Wright) that actually discusses a subacromial/subdeltoid bursitis rather than a hematoma. Id. Dr. Cagle filed the case report as an exhibit.[4]

[4] Alexandra Wright et al., Influenza Vaccine-related Subacromial/Subdeltoid Bursitis: A Case Report, 13 J. RADIOL. CASE REP. 24 (2019). Filed as Exhibit D-1.

Regarding the "pop," Dr. Cagle asserted that a shoulder pop is "clearly a mechanical pathology" that often "correlates with a shoulder structural injury, such as a tear." Exhibit D at 1-2. He again noted the time frame of the pop occurring four months prior to the October 2016 appointment, which "would clearly overlap with the time of vaccination (6/6/16) and provides a mechanical explanation for the pain." Id. at 2. Finally, he stated that "a patient seeking an evaluation, even a few months after a traumatic event, is a normal and expected course. Thus, this clinical picture of a pop and shoulder pain requiring medical attention is a typical finding." Id.

### C. Briefs / Motion for a Ruling on the Record

After the submission of Dr. Cagle's third report, Ms. Chambers was ordered to file a status report advising on how she wanted to proceed. Order (non-PDF), issued Oct. 31, 2023. Ms. Chambers requested that a scheduling order be entered for entitlement briefs. Pet'r's Status Rep., filed Nov. 29, 2023. Ms. Chambers was directed to file a motion for a ruling on the record by February 27, 2024. Deadlines were also set for the Secretary's response and Ms. Chambers's reply. Order (non-PDF), issued Nov. 29, 2024.

#### 1. Ms. Chamber's Motion for a Ruling on the Record

Ms. Chambers filed her Motion for a Ruling on the Record, as ordered, on February 27, 2024. Arguing that it is "well-established in the Vaccine Program that compensation may be awarded for shoulder injuries on a cause-in-fact basis," Ms. Chambers asserts that she has presented a medical theory causally connecting her SIRVA to the Tdap vaccination. Pet'r's Mot. at 9.

Citing Dr. Hussamy, Ms. Chambers defines SIRVA as "the unintentional injection of antigenic material into synovial tissues and/or the subdeltoid bursa causing an immune-mediated inflammatory reaction." Pet'r's Mot. at 10. She posits that her SIRVA is an "atypical SIRVA" as, instead of developing shoulder pain within 48 hours, she developed a hematoma which later became painful, leading to reduced mobility and range of motion and ultimately resulting in a frozen shoulder. Id. Ms. Chambers references the Atanasoff and Bodor & Montalvo articles proffered by Dr. Hussamy, which "were cited as support for the addition of SIRVA to the Vaccine Injury Table." Id. at 10 (citing Atanasoff and Bodor & Montalvo).[5] She also discusses the Chow article, which involved a subacute intramuscular hematoma secondary to a Covid-19 vaccination. Id. at 10-11. Ms. Chambers also cites to the Wood & Ilyas article describing "the typical pathologies associated with SIRVA" including "hematoma, infection, subacromial bursitis, joint synovitis, adhesive capsulitis, and rotator cuff injury." Id. at 11. Although Wood & Ilyas references Wright, which does not discuss hematoma (as Dr. Cagle noted), Ms. Chambers notes that Wright still discusses various underlying injuries related to vaccine administration. Id.

---

[5] S. Atanasoff et al., Shoulder injury related to vaccine administration (SIRVA), 28 VACCINE 8049 (2010). Filed as Exhibit 24.

Marko Bodor & Enoch Montalvo, Vaccination-related shoulder dysfunction, 25 VACCINE 585 (2007). Filed as Exhibit 21.

Ms. Chambers argues that various injuries involving the development of a soft tissue mass at the site of infection, such as hematomas, subcutaneous nodules, and sterile abscesses, have been documented in literature. Pet'r's Mot. at 11. Ms. Chambers states that it is undisputed that she developed a painless lump following vaccination which subsequently became painful. Id. at 11-12. Moreover, her MRI revealed a soft tissue mass that the radiologist and orthopedist both opined was related to vaccination. Id. at 12.

Ms. Chambers summarizes Dr. Hussamy's medical theory: "[Ms. Chambers] developed a hematoma which subsequently became painful, leading to reduced mobility and range of motion, ultimately resulting in frozen shoulder." Pet'r's Mot. at 12. She states that this theory "is supported by medical literature describing injection site injuries and a case study that is directly supportive of this instant matter." Id. at 14 (citing Chow).

Ms. Chambers next argues that she had satisfied her burden under the second Althen prong. Pet'r's Mot. at 14. Prior to vaccination, she had no history of left shoulder injuries. From the first medical appointment post-vaccination, she complained of left shoulder pain related to her June 6, 2016 vaccination. Id. at 15. Ms. Chambers highlights that Dr. Alqueza opined that the Tdap vaccination caused her injuries, concluding that she had a painful hematoma and a possible frozen shoulder due to lack of movement from the pain. Id.

Ms. Chambers disputes the relevance of the "pop" mentioned in the records, arguing that Dr. Cagle has not provided a logical explanation for his theory. Pet'r's Mot. at 16. Moreover, she notes that it was only mentioned once in the medical records, and that her treating physicians nonetheless opined that the Tdap vaccination caused her injuries. Id. at 17.

Finally, Ms. Chambers argues that the onset of symptoms occurred within a medically appropriate timeframe in the context of her theory. Pet'r's Mot. at 18. The development of her hematoma was "immediate" following the Tdap vaccination. Although pain was not immediate, the palpable soft tissue mass was. Id. at 19.

2. The Secretary's Response

The Secretary submitted his response on April 22, 2024. The Secretary first argues that Ms. Chambers has not demonstrated by preponderant evidence that she suffered a medically recognized shoulder injury. Resp't's Resp. at 12. Citing a report on shoulder injuries from the National Academies of Science, Engineering, and Medicine ("NASEM")[6] the Secretary argues that SIRVA is not a specific diagnosis, but a medico-legal term. Id. at 12-13. The Secretary acknowledges Dr. Hussamy's and Dr. Alqueza's references to adhesive capsulitis, but notes the presence of other possible diagnoses such as subscapularis pathology, quadrilateral space syndrome, teres minor muscle atrophy, and biceps tenosynovitis. Id. at 13. With this, the Secretary contends that Ms. Chambers has not provided preponderant evidence of a medically-recognized injury.

---

[6] National Academies of Science, Engineering, and Medicine, Shoulder Injuries and Vaccines, in EVIDENCE REVIEW OF THE ADVERSE EFFECTS OF COVID-19 VACCINATION AND INTRAMUSCULAR VACCINE ADMINISTRATION (Anne R. Bass et al. eds., 2024). Filed as Exhibit E.

The Secretary further argues that Ms. Chambers has not provided a reliable medical theory to link the Tdap vaccine to her shoulder pain. Resp't's Resp. at 14. First, the Secretary disputes that the Tdap vaccine is capable of causing a humeral mass like the one developed by Ms. Chambers. The Secretary explains that subcutaneous nodules are common with subcutaneous vaccine administration, but not intramuscular administration. The CDC directs intramuscular administration for the Tdap vaccine. Id. at 15. The Secretary contends that Ms. Chambers has not argued that her vaccine was administered subcutaneously, nor has she provided evidence that her humeral mass is a subcutaneous nodule. Id.

Next, the Secretary argues that Ms. Chambers did not provide a sound and reliable theory to connect a humeral mass to shoulder pain. Resp't's Resp. at 16. The Secretary disputes the relevance of the literature and case reports provided by Dr. Hussamy. Id. at 16-17.

The Secretary also argues that Ms. Chambers failed to meet her burden under the second Althen prong. The Secretary asserts that Dr. Alqueza's conclusion that the arm mass was vaccine-related was "based purely on [Ms. Chambers]'s own report of symptoms." Resp't's Resp. at 18. The Secretary states that it was unclear when the mass became painful, as it was described as "painless" on October 11, 2016, but "painful" on November 28, 2016. Moreover, the Secretary argues, given that Ms. Chambers reported that the lump was painless on October 11, 2016 but at the same appointment stated that her shoulder pain began two months prior, pain from the humeral mass could not have resulted in her shoulder pain. Id. at 19.

The Secretary raises alternative causes of Ms. Chambers's shoulder pain, such as the biceps tenosynovitis and teres minor muscle atrophy (a condition Dr. Cagle described as a chronic change sometimes caused by quadrilateral space syndrome, which was not investigated) shown on the MRI. Resp't's Resp. at 19. The Secretary draws particular attention to the "pop" reported by Ms. Chambers as a mechanical explanation for her pain. Id. at 20.

The Secretary also disputes that Ms. Chambers has provided reliable evidence to indicate that there was a medically acceptable temporal relationship between her vaccination and the onset of her condition. Resp't's Resp. at 20. He notes that Dr. Hussamy did not propose a range of time that would be medically acceptable to infer causation. Id. at 21. The Secretary contends that Ms. Chambers has not provided preponderant evidence that her humeral mass appeared immediately after vaccination, and has not proposed a timeframe in which the mass could have caused her pain; thus, "it is impossible to analyze whether her symptoms arose within a medically-acceptable timeframe." Id.

3. Ms. Chambers's Reply

Ms. Chambers replied on May 29, 2024. She first requests that the Secretary's arguments regarding the NASEM report be stricken or that Ms. Chambers be permitted to file additional evidence and briefing on the topic, as the report was filed after Dr. Cagle's final report and after Ms. Chambers submitted her motion for a ruling on the record. Pet'r's Reply at 2. Regardless, Ms. Chambers maintains that diagnosis is a vaccine-related hematoma which caused adhesive capsulitis / frozen shoulder. Id.

Next, Ms. Chambers argues that she has "provided evidence of a sound and reliable medical theory in which she developed a painless hematoma from her Tdap vaccine, which subsequently developed into physical symptoms including pain and reduced range of motion." Pet'r's Reply at 3. She again cites to the literature and case reports documenting various injection site injuries, and maintains the relevance and probative value of case reports. Id. at 2-5.

"Perhaps most significant," Ms. Chambers contends, is the opinion of Dr. Alqueza, "who witnessed the course of [Ms. Chambers]'s symptoms in real time [and rendered] an opinion that is entirely consistent with [Ms. Chambers]'s medical theory." Pet'r's Reply at 6. She notes that Dr. Alqueza did not solely rely on a temporal association, but that he carefully considered Ms. Chambers's medical condition and history. Id. at 6-7.

Ms. Chambers draws attention to the fact that the History of Present Illness section of her October 11, 2016 medical record was written by a resident, Dr. Patel. Pet'r's Reply at 7. She argues that Dr. Alqueza's addendum should be given more weight than this section. Id. at 8. Ms. Chambers again notes that Dr. Alqueza opined that her hematoma was likely related to the vaccine, and argues that the fact that he never suspected any of the Secretary's proposed alternative causes to be the source of Ms. Chamber's injury renders the Secretary's argument "weak at best." Id. at 8-9.

As to timing, Ms. Chambers asserts that she consistently connected her injury to her June 6, 2016 vaccine in her visits with doctors. Pet'r's Reply at 10. She further argues that here, where her "treating physician considered the vaccines to be causative, he necessarily concluded that [her] injuries manifested within a medically acceptable period." Id. at 11.

**D. Subsequent Procedural History**

The case was reassigned to the undersigned on March 17, 2026. A status conference was held on June 9, 2026. The parties were directed to file status reports stating whether Ms. Chambers had conveyed a settlement demand to the Secretary and providing any other updates on the status of potential settlement discussions. Order, issued June 10, 2026.

Ms. Chambers sent a demand on June 15, 2026. Pet'r's Status Rep, filed July 8, 2026. However, the Secretary was not interested in exploring informal resolution. Resp't's Status Rep., filed Aug. 3, 2026. The case is thus ready for adjudication.

## III. Standards for Adjudication

A petitioner is required to establish her case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV. Elements of a Petitioner's Claim

To receive compensation, a petitioner must establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E); 42 U.S.C. § 300aa–13(a)(1)(A) (authorizing special masters to award compensation when petitioners establish items listed in section 11(c)(1)). Often a critical element is causation, which is found in paragraph (C) of 42 U.S.C. § 300aa–11(c)(1). When a petitioner seeks compensation for a claim not based upon the Vaccine Injury Table (like Ms. Chambers here), a petitioner is not entitled to a presumption of causation. Instead, a petitioner bears the burden of showing that the vaccine was the cause-in-fact for his injury. For causation-in-fact cases, the Federal Circuit has defined components of a petitioner's burden. Petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

## V. Analysis: Defined Injury

The Federal Circuit has held that, when diagnosis is in dispute, special masters may may make a finding on diagnosis before applying the Althen analysis. Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010).

The Secretary contends that Ms. Chambers cannot proceed on her claim, asserting that she cannot bring an off-Table "SIRVA" claim and has not otherwise provided preponderant proof of a medically-recognized injury. Ms. Chambers disagrees, arguing that she does not exclusively refer to her injury as a "SIRVA" but has presented preponderant evidence of a a hematoma and adhesive capsulitis. Pet'r's Reply at 2-3.

The Secretary is technically correct in his argument that there is no such thing as an off-Table SIRVA, as "SIRVA" is a term used in the VICP referring specifically to the Table injury. However, Ms. Chambers and her expert appear to use "SIRVA" to generically mean a shoulder injury related to vaccine administration, and call her injury an "atypical SIRVA." Although, arguably, such an injury cannot exist, as an injury must meet very specific criteria on the Table to qualify as a SIRVA, special masters have also often referred to injuries as "non-Table SIRVA" or "off-Table SIRVA." See, e.g., Guyette v. Sec'y of Health & Hum. Servs., No. 21-716V, 2026 WL 2413078, at *8 (Fed. Cl. Spec. Mstr. June 29, 2026) (dismissing Table SIRVA claim but allowing petitioner to proceed on "non-Table SIRVA" claim); Salzer v. Sec'y of Health & Hum. Servs., No. 19-1650V, 2025 WL 3527531, at *14 (Fed. Cl. Spec. Mstr. Nov. 7, 2025)

(denying compensation for off-Table SIRVA claim but advising "This does not mean that *all* non-Table SIRVAs will fail, or should. But a more robust showing must be made than was offered in this case if they are going to succeed"); Bulman v. Sec'y of Health & Hum. Servs., No. 19-1217V, 2023 WL 5844348, at *6 n.4 (Fed. Cl. Spec. Mstr. Aug. 16, 2023) ("However, resolution of the present claim does not turn on whether a non -Table SIRVA is or is not an injury, but rather whether the facts of *this* case undercut the conclusion that Petitioner's at least SIRVA-like presentation could be vaccine-associated—given the non-Table onset plus evidence of other explanations for the injury"); Porcello v. Sec'y of Health & Hum. Servs., No. 17-1255V, 2020 WL 4725507, at *9 (Fed. Cl. Spec. Mstr. June 22, 2020) (analyzing case as "non-Table SIRVA claim" but denying compensation for failure to meet third Althen prong).

Moreover, Dr. Hussamy also refers to Ms. Chambers's injury as a frozen shoulder / adhesive capsulitis, caused by a hematoma which was caused by the vaccine. In all, Ms. Chambers has sufficiently alleged a defined injury.[7]

## VI. Analysis: Althen Prong One

The first Althen prong requires the petitioner to provide a "sound and reliable" medical theory demonstrating that the vaccine can cause the alleged injury. Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359 (Fed. Cir. 2019) (quoting Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d 543, 548 (Fed. Cir. 1994)). The petitioner must also offer "a reputable or scientific explanation that pertains specifically to [their] case." Moberly, 592 F.3d at 1322.

Ms. Chambers describes the theory proffered by her expert: "Dr. Hussamy's theory is that Petitioner developed a hematoma which subsequently became painful, leading to reduced mobility and range of motion, ultimately resulting in frozen shoulder." Pet'r's Br. at 12. As there are two steps to this theory – the development of a hematoma and the development of a frozen shoulder – the analysis for each prong is divided into two parts.

### A. Subcutaneous Injury

Ms. Chambers cites to medical literature describing site injection injuries caused by vaccinations. The Secretary argues that these are subcutaneous injuries, which occur more commonly after subcutaneously administered vaccines than after intramuscularly administered vaccines such as the Tdap vaccine. Resp't's Br. at 14-15.

The Secretary is correct in that the literature supports a finding that subcutaneous injuries occur far more commonly after subcutaneously administered vaccines than after intramuscularly administered vaccines. However, the literature also demonstrates that an intramuscular vaccine can cause subcutaneous injuries if it is not properly administered.

[7] To avoid debates over terminology and the sufficiency of claims, attorneys and their experts should refrain from using terms such as "off-Table SIRVA" or "non-Table SIRVA" to refer to generic vaccine-induced shoulder injuries.

The Silcock article explains the importance of the route of administration to the rate of adverse events following immunizations. For example, "in 2003 . . . a high incidence of subcutaneous nodules was reported following a period of subcutaneous administration of a particular vaccine, [but] these nodules did not occur subsequent to the correct intramuscular administration of the same vaccine." Silcock at 407.[8] "There may also be a significant time (months to years) between vaccine administration and lump or mass noted at the physical site." Id. at 408. Regarding recurrence of subcutaneous injuries, the authors recommend deep intramuscular immunization as this "has been hypothesized to reduce the amount of inadvertent vaccine material in the subcutaneous tissue." Id. Likewise, the Cook article provides a discussion of "adverse events due to inadvertent subcutaneous rather than intramuscular injection." Cook at 1186.[9]

The Kaya & Kaya article is a case report describing a patient who developed sterile abscesses following a Tetanus-diphtheria vaccination. Kaya & Kaya at 2.[10] The Kaya & Kaya authors advise that "Proper injection technique is a critical component of a successful immunization" and that "Adverse events are more common if a vaccine is administered subcutaneously instead of intramuscularly." Id. at 4. The authors posited that as the patient's "abscesses were located in the subcutaneous area and the muscle tissue was not involved . . . a sterile abscess could have resulted from misinjection." Id.

The Chow article describes two cases of patients who developed shoulder injuries after receiving the Covid vaccine. Ms. Chambers focuses on the second case, which describes a man who developed progressive pain and swelling two weeks after receiving the second dose. Pet'r's Br. at 10-11; Chow at E46. The injury was later determined to be "consistent with a subacute intramuscular hematoma, secondary to the recent vaccine administration." Chow at E46. The authors opined that "Although intramuscular hematoma is a less common manifestation of SIRVA than bursitis, it may result from the needle injuring an intramuscular vessel at the time of vaccination." Id. at E47. They further note that most SIRVA cases in the literature occur in women, "as women generally have less deltoid muscle mass than men, making them more vulnerable to injuries from longer needles or poor technique." Id. at E48. "Most patients report severe pain within the first 48 hours, and some report delayed symptoms of up to 2 months." Id.

Thus, Ms. Chambers's evidence demonstrates that a vaccine intended to be injected intramuscularly may cause a subcutaneous injury if improperly administered.

---

[8] Rowena Silcock et al., Subcutaneous nodules: an important adverse event following immunization, 18 EXPERT REV. VACCINES 405 (2019). Filed as Exhibit 39.

[9] Ian F. Cook, Best vaccination practice and medically attended injection site events following deltoid intramuscular injection, 11 HUM. VACCIN. IMMUNOTHER. 1184 (2015). Filed as Exhibit 40.

[10] Abdurrahman Kaya & Sibel Yildiz Kaya, A case of recurrent sterile abscesses following tetanus-diphtheria vaccination treated with corticosteroids, 21 BMC INFECT. DIS. 1 (2021). Filed as Exhibit 41.

**B. Adhesive Capsulitis / Frozen Shoulder**

The next step of Ms. Chambers's theory is that a subcutaneous injury can result in adhesive capsulitis (sometimes referred to as a "frozen shoulder" or "frozen shoulder syndrome"). As explained in the Degreef & Debeer article:

> Frozen shoulder syndrome is characterized by an adhesive capsular inflammation of the glenohumeral joint. This initially leads to a painful shoulder (stage 1), is then followed by a freezing phase with a progressive decrease in both active and passive glenohumeral mobility (stage 2) and proceeds towards a thawing phase with a decrease in tenderness and a (partial) recovery of range of motion (stage 3).

Degreef & Debeer at 447.[11] "Secondary forms are preceded by an injury or surgical procedure." Id.

The proposition that a shoulder injury can result in adhesive capsulitis has been accepted in the Program. See, e.g., Small v. Sec'y of Health & Hum. Servs., No. 15-478V, 2019 WL 6463985, at *17 (Fed. Cl. Spec. Mstr. Nov. 1, 2019) ("adhesive capsulitis is known to occur as a result of long term 'favoring' or disuse of the shoulder as a pain response") (citing Tenneson v. Sec'y of Health & Human Servs., 142 Fed. Cl. 329 (2019) (noting in a prior SIRVA case that petitioner "apparently consulted with an orthopedist who 'felt [it] unlikely [that] this is all related to flu shot' but who acknowledged that [petitioner] 'certainly could have developed a frozen shoulder if she hasn't moved it x 5 mo' since the flu vaccination"); Marcus v. Sec'y of Health & Hum. Servs., No. 19-812V, 2025 WL 1984348, at *16 (Fed. Cl. Spec. Mstr. Mar. 17, 2025) (crediting explanation that "petitioner's course is consistent with an inflammatory response to a vaccine in the shoulder region, resulting in adhesive capsulitis as a result of pain limited non-use over time").

These cases often involve SIRVA claims. See, e.g., Gurney v. Sec'y of Health & Hum. Servs., No. 17-481V, 2019 WL 2865490, at *6 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) ("adhesive capsulitis is a common sequela of SIRVA. It has been seen in numerous SIRVA cases resolved in this program and has not been considered an impediment to compensation"); Id. at n.6 (citing cases).

However, it is the disuse of the arm – not the fact that it is a SIRVA – that results in the frozen shoulder. Kent v. Sec'y of Health & Hum. Servs., No. 17-73V, 2019 WL 1556824, at *13 (Fed. Cl. Spec. Mstr. Feb. 12, 2019) (finding that petitioner met the criteria for on-Table SIRVA and had also provided preponderant evidence to satisfy the Althen prongs to establish that the flu vaccine caused her left shoulder pain and resultant adhesive capsulitis); Egger v. Sec'y of Health & Hum. Servs., No. 19-98V, 2022 WL 5237090, at *4, 7 (Fed. Cl. Spec. Mstr. Aug. 29, 2022) (crediting petitioner's argument that her "frozen shoulder [was] secondary to the pain and disuse associated with both the flu shot and her Hashimoto's"). It stands to reason, then, that disuse of the arm caused by the pain of a non-SIRVA injury could also result in adhesive capsulitis. This

[11] I. Degreef & Ph. Debeer, Post-vaccination frozen shoulder syndrome. Report of 3 cases, 112 ACTA. CHIR. BELG. 447 (2012). Filed as Exhibit 30.

aspect of Ms. Chambers's theory is also credited.

Having provided evidence that a vaccine (intended to be administered intramuscularly) can cause a subcutaneous injury, and given that immobility of the arm can result in a frozen shoulder, Ms. Chambers has prevailed under the first Althen prong.

## VII. Analysis: Althen Prong Two

The second Althen prong requires preponderant evidence for "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." Althen, 418 F.3d at 1278. With respect to this prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).

### A. Subcutaneous Injury

The evidence proffered by Ms. Chambers in support of her theory discusses subcutaneous injuries. The Secretary contends that Ms. Chambers has "provided no evidence that [her] humeral mass is a subcutaneous nodule." Id. at 15. However, the February 13, 2017 MRI found "a 6 mm focus of T1 hyperintensity in the subcutaneous tissue with surrounding fat stranding, likely representing a hematoma related to the recent [vaccine]." Exhibit 4 at 25-26. It would appear, then, that Ms. Chambers's hematoma was a subcutaneous injury.

The Secretary also argues that, even if the injury is subcutaneous, it was likely not caused by the vaccine, which is meant to be administered intramuscularly. As explained in Section VI.A above, a vaccine intended to be given intramuscularly may still cause a subcutaneous injury if it is improperly administered.

Ms. Chambers did not present any photographs of the alleged site injection injury. The record seems to indicate that the vaccine was administered in the left deltoid. Exhibit 5 at 9 (noting the site as "LD"). Ms. Chambers has not argued that the vaccine was improperly administered. However, the facts of the case are unusual.

As noted by Dr. Cagle, the mass was lower on Ms. Chambers's arm than would be typical for a vaccination. The November 1, 2016 MRI of Ms. Chamber's left shoulder did not go low enough to depict the painful lump. Exhibit 3 at 30. The February 13, 2017 MRI of Ms. Chamber's humerus depicted the lump along the mid-humerus, which Dr. Cagle explained "is nearly halfway down the arm." Exhibit A at 3. He opined, "It is unlikely the vaccination was given in such a distal location, but assuming that it was, this is distal to the rotator cuff and shoulder capsule later discussed to have caused the frozen shoulder." Id.

However, Ms. Chambers and her coworkers all attest to the swelling and lump being at the site of the injection. Exhibits 6-8. When Ms. Chambers told her providers that this was the injection site, they appear not to have questioned it. See, e.g., Exhibit 3 at 16, 34 (Dr. Alqueza); Exhibit 4 at 25-26 (radiologist), 40 (Ms. Miras).

Ms. Chambers's testimony that the lump and swelling developed at the injection site is credited. Thus, it appears that the vaccine was given at an unusually low location.

While most SIRVA cases involve vaccines given in an unusually high location, injury can occur when the vaccine is given too low as well. See Kirby v. Sec'y of Health & Hum. Servs., No. 16-185V, 2019 WL 6336026, at *16-17 (Fed. Cl. Spec. Mstr. Nov. 1, 2019) (crediting petitioner's account that "vaccination was administered lower than usual" and doctor's note of distal location to find that vaccine injured radial nerve), mot for rev. granted, 148 Fed. Cl. 530 (2020), reinstated, 997 F.3d 1378 (Fed. Cir. 2021); B.B. v. Sec'y of Health & Hum. Servs., No. 17-1659V, 2024 WL 2136016, at *17 (Fed. Cl. Spec. Mstr. Apr. 19, 2024) (crediting petitioner's account that "her Tdap vaccine was administered too low, well below her deltoid muscle," at the area where the deltoid attaches to the humerus, which resulted in a deltoid tendinopathy). The articles provided by Ms. Chambers discuss the importance of selecting a proper site. "Generally, it is possible to accurately identify the optimal site 'by having the vaccine recipient place their hand on their hip . . . and having the injection into the mid-point of the [deltoid] muscle.'" Arias at 4874 (quoting Cook at 1188).[12] "Needle placement during intramuscular administration is into the thickest portion of the deltoid muscle. It is recommended that the needle should be injected at a 90° angle, directly into the center of the deltoid muscle." Wood & Ilyas at 116. Additionally, the literature notes that "women generally have less deltoid muscle mass than men, making them more vulnerable to injuries from longer needles or poor technique." Chow at E48.

Thus, the location of the vaccination and the thickness of the muscle at the site is relevant to the likelihood of injury. Ms. Chambers's vaccine was administered low on her deltoid, where the muscle is not as thick. Figure 1 from the Wood & Ilyas article, depicting the proper vaccination site, is included below to illustrate:




[12] L. H. Martín Arias et al., Risk of bursitis and other injuries and dysfunctions of the shoulder following vaccinations, 35 VACCINE 4870 (2017). Filed as Exhibit 28.

Wood & Ilyas at 113. There was consequently a higher likelihood of Ms. Chambers developing a subcutaneous injury from the June 6, 2016 vaccination.

The evidence thus preponderates in favor of finding that Ms. Chambers's vaccine was given at an unusually low site on her arm, and her subcutaneous injury was caused by an improperly administered vaccine.

Whether or not the humeral hematoma was a source of pain and, if so, when the pain began, is another point in dispute. Ms. Chambers's reports of pain are as follows:

| Date | Author | Report | Citation |
|---|---|---|---|
| 10/3/2016 | Certified Nurse Berk, midwife | "Med hx left shoulder post Tetanus shot . . . has [illegible] area on upper arm at injection site." | Exhibit 2 at 29 |
| 10/11/2016 | Dr. Patil, orthopedic resident | "Left shoulder pain x 2 months."<br><br>"Tetanus shot about 4 months ago . . . painless 'lump' ever since."<br><br>"Painless mass palpated in the lateral arm at the level of the midshaft humerus." | Exhibit 3 at 14, 15 |
| 10/19/2016 | Ms. DeMarco, Sedgwick Claims Management Services claims representative | "Received a tetanus shot on her left arm and now has a hard lump that is causing pain to shoot up her arm into the shoulder." | Exhibit 15 at 186 |
| 11/28/2016 | Dr. Alqueza, orthopedist | "painful lump" | Exhibit 3 at 30 |
| 2/6/2017 | Ms. DeMarco, Sedgwick Claims Management Services claims representative | "the hard painful lump on her shoulder that she sustained after being vaccinated" | Exhibit 15 at 137 |
| 2/13/2017 | Unclear; likely Dr. Smith, radiologist, or Dr. George, MBBS | "painful lump for many months at the level of the deltoid insertion" | Exhibit 4 at 25, 29 |
| 2/15/2017 | Dr. Alqueza, orthopedist | Requesting that Ms. Chambers come in for an appointment to | Exhibit 3 at 47 |

| | | | |
|---|---|---|---|
| | | ascertain "if the lump is the cause of her pain" | |
| 2/28/2017 | Dr. Bhashyam, orthopedic resident | "painful left arm hematoma and a stiff left shoulder" | Exhibit 3 at 53 |
| 2/28/2017 | Dr. Alqueza, orthopedist | "I think because of the pain at the deltoid from the vaccination she did not move her shoulder" | Exhibit 3 at 54 |
| 3/11/2017 | Ms. Miras, physical therapist | "The lump has gotten progressively harder and more bothersome." | Exhibit 4 at 40 |
| 5/15/2017 | Dr. Alqueza, orthopedist | "She does have a small hematoma in proximity of her pain from a Td shot" | Exhibit 3 at 63 |

The Secretary emphasizes the October 11, 2016 record stating that Ms. Chambers was experiencing shoulder pain when the mass was "painless." Respt's Br. at 19. "Because her humeral mass was painless at the time," the Secretary contends, "pain from the humeral mass could not have led to the development of her shoulder pain on that date." Id.

Ms. Chambers responds to this argument by arguing that it is "noteworthy" that the report was written by an orthopedic resident (Dr. Patil). Pet'r's Reply at 7. Ms. Chambers further highlights that Dr. Alqueza created an addendum to the resident's report in which he noted that the swelling from the vaccination had not resolved. Id. at 7-8

Although Dr. Alqueza added to the resident's report, he did not contradict the description of the hematoma as painless. However, this still does not definitively show that there was no pain associated with the hematoma. Dr. Cagle stated: "A painless mass is one where the provider inspects and feels the mass and the patient reports they don't experience pain." Exhibit A at 3. Dr. Patil recorded: "Painless mass palpated in the lateral arm at the level of the midshaft humerus." Exhibit 3 at 15. This could, arguably, indicate that the mass was painless to palpation (as Dr. Cagle suggested), not necessarily painless overall.

Regardless of the meaning of the statement, it is notable that Dr. Patil's record is the only record that describes the hematoma as painless. The email between Sedgwick employees sent only eight days later describes the hematoma as "a hard lump that is causing pain to shoot up her arm into the shoulder." Exhibit 15 at 186. Subsequent records refer to the lump as painful, bothersome, or in proximity of her pain. The weight of these records against the single October

11, 2016 record favors a finding that the hematoma caused Ms. Chambers to experience pain up to her shoulder.[13]

The next question, then, is whether Ms. Chambers has established that she suffers from adhesive capsulitis as a result of the hematoma.

**B. Adhesive Capsulitis / Frozen Shoulder**

The Secretary disputes that Ms. Chambers has established that her injury is adhesive capsulitis. The Secretary highlights that Ms. Chambers and Dr. Hussamy refer to the injury as "SIRVA," "off-Table SIRVA," or generically as a "shoulder injury." Resp't's Br. at 13. The Secretary acknowledges that Dr. Alqueza "proposed a possible diagnosis of adhesive capsulitis," but also notes Dr. Alqueza did not make this diagnosis for several months and that he previously "posited diagnoses of other conditions, including subscapularis pathology and quadrilateral space syndrome." Id. Moreover, the MRI did not show thickening of the capsule. In sum, the Secretary argues, "Given the number of possible diagnoses, [Ms. Chambers] has not shown by a preponderance of the evidence that she suffered from any particular diagnosis." Id.

In reply, Ms. Chambers cites to Dr. Hussamy's first report, in which he states that Ms. Chambers "developed adhesive capsulitis of the left shoulder." Pet'r's Reply at 2 (citing Exhibit 18 at 4). She continues to rely on Dr. Alqueza's diagnosis as well, referencing his statement: "because of the pain at the deltoid from the vaccination[,] she did not move her shoulder and thus has a frozen shoulder." Id. (citing Exhibit 3 at 52). Ms. Chambers disputes that the timing of the diagnosis has any relevance to its validity. She points out that in the NASEM report cited by the Secretary, the "authors note, with respect to adhesive capsulitis, that 'in the early stages, when the condition may be inflammatory, it is often a clinical diagnosis of exclusion, as it shares symptoms with other shoulder conditions.'" Id. at 3 (quoting NASEM Report at 269).

The providers who treated Ms. Chambers opined that she had adhesive capsulitis. Dr. Alqueza noted that the MRI did not indicate a frozen shoulder, but nonetheless regarded it as a possibility and sought to examine Ms. Chambers further. Exhibit 3 at 47. After examination, he opined, "Clinically she seems to be having adhesive capsulitis even though shoulder MRI did not show thickening of her capsule." Id. at 54. Dr. Alqueza later reported that there was "thickening of the IGHL [inferior glenohumeral ligament]" in explaining that Ms. Chambers appeared to have adhesive capsulitis. Exhibit 3 at 63. This is known to be a sign of adhesive capsulitis. See, e.g., Copeland v. Sec'y of Health & Hum. Servs., No. 24-1043V, 2025 WL 2733447 (Fed. Cl. Spec. Mstr. Aug. 25, 2025); Ross v. Sec'y of Health & Hum. Servs., No. 17-1992V, 2021 WL 5232350 (Fed. Cl. Spec. Mstr. Oct. 13, 2021).

In addition to Dr. Alqueza, a resident who examined Ms. Chambers and two physical therapists opined that Ms. Chambers's symptoms were consistent with adhesive capsulitis. Exhibit 3 at 53 (Dr. Bhashyam); Exhibit 4 at 42 (Ms. Miras) and 53 (Ms. Throneburg).

[13] This section does not address *when* the hematoma began to cause pain. This is discussed in Section VIII.A.2 below.

The delay in diagnosis does not indicate unreliability. Regarding adhesive capsulitis, the NASEM Report states:

> The cause of frozen shoulder is still unclear, and diagnosis often comes at later stages, when a fibrotic process greatly limits motion and function. The clinical diagnosis is least clear early on, and a diagnosis months to years later makes establishing a cause and effect unlikely, given the many confounding factors over time.

NASEM Report at 15. The delay in Ms. Chambers's diagnosis thus appears to be typical of adhesive capsulitis diagnoses.

The evidence favors a finding that Ms. Chambers suffered from adhesive capsulitis. Her affidavit and medical records show that she was unable to fully use her arm due to the pain of her subcutaneous injury. Exhibit 6 ¶ 8; Exhibit 3 at 14. It is logical to conclude that this disuse resulted in the frozen shoulder.[14] Additionally, Ms. Chambers's treaters opined that she suffered from adhesive capsulitis. These assessments were based not only on Ms. Chambers's disclosure of the June 6, 2016 vaccination preceding the symptoms, but also upon the treaters' examination of Ms. Chambers and evaluation of her symptoms. See Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006) ("The fact that these physicians' diagnoses may have relied in part on the temporal proximity of [the petitioner's] injuries to the administration of the vaccine is not disqualifying"). Ms. Chambers has met her burden under the second Althen prong.

## VIII. Analysis: Althen Prong Three

The remaining Althen prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013). As with Ms. Chambers's theory of causation, there are two components to the medically acceptable timeframe: first, the appropriate timeframe to develop a subcutaneous injury, and second, the appropriate timeframe for arm pain to lead to adhesive capsulitis.

---

[14] Ms. Chambers's eventual disuse of her arm following her vaccination need not have been the sole cause of her adhesive capsulitis; rather, a petitioner must show that "the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Shyface v. Sec'y, Health & Hum. Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Here, where Ms. Chambers did not have a history of arm pain pre-vaccination, and Dr. Alqueza noted that "because of the pain at the deltoid from the vaccination[,] she did not move her shoulder and thus has a frozen shoulder" (Exhibit 3 at 52), Ms. Chambers has shown that the vaccination was a but-for cause of and substantial factor in her injury.

### A. Subcutaneous Injury

1. Medically Appropriate Timeframe

The literature regarding subcutaneous injuries provides some insight as to the medically appropriate timeframe to infer that a vaccination caused the injury. For example, "Subcutaneous nodules may be identified shortly after vaccination (eg. days to weeks). There may also be a significant time (months to years) between vaccine administration and lump or mass noted at the same physical site." Silcock at 407. In the Kaya & Kaya case report, a patient with sterile subcutaneous abscesses stated that the swelling had started 4 days post-vaccination. Kaya & Kaya at 2. Similarly, the Arias paper reviewed cases of injection site injuries manifesting within a few hours to several days to two months. Arias at 4871 (Table 1). The NASEM report reviewed case reports of injection site injuries with onsets ranging from immediately post-vaccination to two weeks post-vaccination. NASEM Report at 8-9 (Table 10-1).

2. Onset of Injury

Although Ms. Chambers does not refute that the hematoma itself began as painless, she maintains that it developed right after the vaccination: "While Petitioner did not immediately develop pain, she did immediately develop a palpable soft tissue mass at the injection site." Pet'r's Br. at 19. The Secretary disputes that Ms. Chambers has provided evidence that the mass developed immediately. Resp't's Br. at 21.

Ms. Chambers reported to Dr. Patel that she had the lump "ever since" her vaccination. Exhibit 3 at 14. Similarly, it was reported to the Sedgewick claims managers that she developed it "after being vaccinated," although a timeframe is not given. Exhibit 15 at 137. In her affidavit, Ms. Chambers avers that the injection site was "hard and swollen" in the days and weeks after she received the vaccine. Exhibit 6. A coworker, Kellie Simonini, likewise recalled that one "could still clearly see the [site] of injection protruding" in the days and weeks following the vaccination. Exhibit 8. Ms. Chambers's statement that she developed the hematoma or lump within a few days of vaccination is credited.

Although stating in her brief that she did not immediately develop pain, Ms. Chambers recalls in her affidavit that her arm "was sore and painful at the injection site" the day after vaccination. Exhibit 6. Her coworker Irene Gendel corroborates this, averring that Ms. Chambers "complain[ed] about unusual pain upon returning to work, which got progressively worse over several days and then months." Exhibit 7. This supports a conclusion that although the pain did not develop immediately after the vaccine in the strictest sense, it began within a day of the June 6, 2016 vaccination.

### B. Adhesive Capsulitis / Frozen Shoulder

1. Medically Appropriate Timeframe

As to adhesive capsulitis, the literature indicates that the pain is usually progressive and it may be months before patients present to doctors for their frozen shoulders. The Barnes case report describes a patient who received the vaccine "approximately 2 months before" presenting to a doctor for pain and reported 6 weeks of progressive limitations of range of motion and

increasing pain. Barnes at 919.[15] Likewise, the Degreef & Debeer paper reports two patients who presented for pain two months after receiving vaccines. Both described the pain as progressive, one specifying that the symptoms had progressed over 6 weeks before she lost all mobility in her shoulder. Degreef & Debeer at 447. Another patient in Degreef & Debeer reported a "sudden onset of severe right shoulder pain after a tetanus vaccination 6 months earlier." Degreef & Debeer at 447. The NASEM report shows that some patients develop symptoms within the following day, while others have symptoms manifest weeks or up to four months later. NASEM Report at 16 (Table 10-3). Frozen shoulder appears to take, on average, approximately two months from the onset of arm pain / disuse to develop.

2. Onset of Injury

The conclusion that Ms. Chambers began to experience pain in her arm within a day of the vaccination does not contradict the medical records reporting an onset of *shoulder* pain in August 2016. In the context of discussing her arm pain, Ms. Chambers states that a "few days [after the day following the vaccination], the pain was worse and the injection site was still swollen. Exhibit 6 ¶ 4. Then, "Days turned into weeks and my shoulder pain worsened." Id. ¶ 5. After a few more weeks, the "pain had gotten progressively worse, especially my shoulder." Id. ¶ 7. She stopped going to the gym and needed help to get dressed. Id. ¶ 8.

Ms. Chambers recalled explaining to Dr. Alqueza that she "started with arm pain but [it] eventually became shoulder pain." Exhibit 6 ¶ 9. At her October 11, 2016 appointment, Ms. Chambers reported "left shoulder pain x 2 months" and that "Her shoulder pain did not start until 2 months ago." Exhibit 3 at 14. The handwritten acupuncture records from November 8, 2016, also document left shoulder pain and contain a notation that says "since tetanus shot" and then "2 months." Exhibit 10 at 3. The practice later sent a transcribed version, but it is unclear who prepared the transcription. The transcribed version reads "since tetanus shot 2 months ago." Exhibit 11 at 2. However, this is not the likely meaning of the note, as Ms. Chambers received the vaccine five months prior. Another possible reading is that the shoulder pain began two months prior to the acupuncture appointment (i.e., in September 2016). The more likely meaning is that the pain began two months after the shot, which would be consistent with Ms. Chambers's other reports.

The records thus indicate that there were two distinct areas of pain for Ms. Chambers: her arm pain, which started first and progressively worsened, and her shoulder pain, which appeared later. The shoulder pain was admittedly not immediate – thus disqualifying her from pursuing a SIRVA claim – but her arm pain around the injection site began close in time to the vaccination. Her pain and its progression over several weeks, leading to shoulder pain two months later and ultimately a frozen shoulder, fits within the accepted timeframe.

## IX. Alternative Causes

"Once the petitioner has established a prima facie case for entitlement to compensation and thus met her burden to prove causation-in-fact, the burden shifts to the government to prove

---

[15] Matthew G. Barnes et al., A "Needling" Problem: Shoulder Injury Related to Vaccine Administration, 25 J. AM. BOARD FAM. MED. 919 (2012). Filed as Exhibit 25.

'[by] a preponderance of the evidence that the [petitioner's injury] is due to factors unrelated to the administration of the vaccine described in the petition.' . . . If the government fails to meet this burden, the petitioner is entitled to compensation. So long as the petitioner has satisfied all three prongs of the Althen test, she bears no burden to rule out possible alternative causes. Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1352 (Fed. Cir. 2008) (citing 42 U.S.C. § 300aa–13(a)(1)(B); Walther v. Sec'y of Health & Hum. Servs., 485 F.3d 1146, 1149-50 (Fed. Cir. 2007)).

The Secretary argues that the "pop" referenced in the medical records is a better explanation for Ms. Chambers's injury. The Secretary also suggests several potential alternative causes and diagnoses. Resp't's Br. at 19-20. These arguments are both addressed.

**A. Shoulder "Pop"**

Ms. Chambers highlights the opinions of her treating doctor, Dr. Alqueza. In the same vein, she argues that less consideration should be given to the record written by the resident, Dr. Patel. It is not clear that Dr. Patel's record is unreliable. Dr. Alqueza wrote an addendum to his assessment and plan, but did not contradict anything that Dr. Patel wrote; in fact, he wrote that he reviewed and agreed with the record. Exhibit 3 at 15. However, Dr. Patel's record merits further discussion as it mentions a "pop" in Ms. Chambers's shoulders.

Dr. Cagle stated, "A 'pop' in the shoulder is clearly a mechanical pathology . . . Many times (from my own experience) this correlates with a shoulder structural injury, such as a tear." Exhibit D at 1-2.

Ms. Chambers avers that she did not experience a "pop" in her shoulder, nor did she report one to Dr. Patel. Exhibit 6. She notes that she did not tell any other providers about experiencing a "pop" and was always adamant that she believed it was connected to the vaccine. Id.

It is true that Ms. Chambers did not report a pop to any other providers, both before seeing Dr. Patel (at her October 3, 2016 gynecological appointment where she reported pain) or after (at her March 3 and March 11, 2017 physical therapy appointments). Dr. Alqueza apparently did not find the report noteworthy, as he never followed up on Dr. Patel's note about a pop. See generally Exhibit 3.

It is difficult to discredit Dr. Patel's record. He twice stated that Ms. Chambers reported a pop, and Dr. Alqueza reviewed and approved of what Dr. Patel wrote. However, whether or not Ms. Chambers reported a pop to Dr. Patel need not be determined. The evidence supports a finding that, even if Ms. Chambers did experience a pop, it was not the cause of her shoulder pain. Dr. Cagle explained that a pop would suggest "a shoulder structural injury, such as a tear." Exhibit D at 2. While this is likely true in many cases, there is no evidence in Ms. Chambers's medical records of a tear. See Exhibit 4 at 15 (specifically noting no rotator cuff tear). Both of the physical therapists who evaluated Ms. Chambers opined that her symptoms were consistent with adhesive capsulitis. Given that Ms. Chambers did not report a pop to them, it is entirely unknown how much (if at all) such a report would have impacted their analysis. Regardless, the

provider who *did* read the notation about a pop, Dr. Alqueza, nonetheless opined that Ms. Chambers had adhesive capsulitis.

### B. Other Diagnoses

The Secretary and Dr. Cagle note that several other diagnoses and potential alternative causes were proposed for Ms. Chambers, including biceps tenosynovitis, teres minor muscle atrophy, subscapularis pathology, and quadrilateral space syndrome. However, the Secretary and Dr. Cagle also correctly note that none of these were investigated further. Resp't's Br. at 19 (citing Exhibit A at 2-3). It therefore cannot be said that any of these conditions was the more likely cause of Ms. Chambers's injury and pain, and the Secretary has thus not shown by a preponderance of evidence that another condition or mechanism caused Ms. Chambers's injury.

## X. Conclusion

As evident in medical records and consistent with Ms. Chambers's expert and treating doctors, Ms. Chambers has preponderantly established that she is entitled to compensation. A separate order regarding damages will issue.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master